**FILED**
**JULY 14, 2026**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Detention of: | ) | No. 40994-5-III |
| | ) | |
| N.P. | ) | UNPUBLISHED OPINION |

HILL, J. — N.P. suffers from severe schizophrenia and has been committed to the Department of Social and Health Services for involuntary treatment at Eastern State Hospital (ESH) since 1993. In 2024, ESH sought an extension of N.P.'s commitment for treatment, as well as authorization to continue administering antipsychotic medications. Because one side effect of the antipsychotic medication, Clozaril, is a low white blood cell count, ESH requested that the trial court authorize involuntary blood draws to monitor N.P.'s symptoms while taking the medication. The court granted the extension, permitted the continued administration of the antipsychotic medications, and authorized involuntary blood draws as medically necessary to monitor N.P.'s health.

N.P. appeals the trial court's authorization that he undergo involuntary blood draws. He first argues that the court did not have statutory authority to authorize involuntary blood draws under RCW 71.05.215(1), a provision of Washington's Involuntary Treatment Act (ITA), chapter 71.05 RCW. N.P. further argues that the trial court violated his right to privacy under both the Washington State Constitution and the

United States Constitution by authorizing the involuntary blood draws without a warrant or under an exception to the warrant requirement.

We disagree with these arguments and affirm.

BACKGROUND

Since 1993, N.P. has been committed to ESH for involuntary treatment pursuant to the ITA because he suffers from severe schizophrenia symptoms.

In December 2024, ESH moved for a 180-day commitment extension. N.P. was 75 years old when the motion was filed. In an affidavit in support of the motion, Jonathan Curtis, PsyD, expressed that he examined and evaluated N.P. and was of the opinion that N.P. required further commitment. Dr. Curtis determined that N.P. was gravely disabled and indicated there was "no less restrictive treatment available as an alternative to detention than that of hospitalization." Clerk's Papers (CP) at 6. Jaime Basnillo, MD, N.P.'s treating doctor at ESH, filed a request to extend N.P.'s current prescribed antipsychotic medications: Abilify, Clozaril, and Zyprexa.

The superior court held a hearing on ESH's requests to extend N.P.'s commitment for involuntary treatment and for authorization to continue to administer N.P.'s prescribed antipsychotic medications. During the hearing, Dr. Basnillo offered testimony relevant to this appeal that we address in more detail below.

The superior court granted the 180-day involuntary treatment extension. In addressing the request for authorization to continue to administer N.P.'s prescribed

antipsychotic medications, the court found by clear, cogent, and convincing evidence that there was a compelling state interest in N.P. remaining on his medications given the severity of his disability. The court further addressed the request made by ESH that N.P. undergo involuntary blood draws while taking Clozaril:

> As far as the issue of the—whether a blood draw is included in that or not. If a blood draw is a necessary portion of this prescription, it seems reasonable to me that that would be—that there would be a blood required as part of a treatment plan. Again, I'm not a doctor. I don't make that—I don't make a diagnosis, I don't prescribe anyone anything, but if that is something that is required by the doctor in regards to this medication, that seems reasonable.
>
> And for a court order of a blood draw in a criminal matter, there has to be probable cause to request a warrant for a blood draw. A judicial officer will order that warrant. And, this is by a higher standard than that, having something be by clear, cogent and convincing evidence that there has to be involuntary medication. So I don't think it's inappropriate.
>
> I'm not specifically making any ruling saying that the Hospital shall do a blood draw, but I don't see any reason here why the Court couldn't allow that as part of a treatment plan. It seems reasonable. It seems that that is what has been happening in the past, that has been reviewed by other commissioners. So this Court is not going to make some kind of a finding that that is inappropriate. Not making a finding that that must happen, but finding that if a blood draw is part of the involuntary treatment plan, that that would be appropriate.

Verbatim Rep. of Proc. (VRP) at 34.

After the hearing, the superior court entered their decision in the "Findings, Conclusions, and Order Authorizing Administration of Anti-Psychotic Medications." CP at 21. The order provided, in relevant part, that ESH was authorized to administer three antipsychotic medications: Abilify, Clozaril, and Zyprexa. Finding of fact 15 read:

3

> Other: Consistent with any applicable regulations and generally accepted medical practices regarding treatment with Clozaril, the Court authorizes involuntary blood draws to the extent necessary to protect the patient's health and monitor the patient for any potential adverse side effects of Clozaril.

CP at 25 (emphasis omitted).

N.P. challenges this finding on appeal.

ANALYSIS

*Involuntary Blood Draws*

N.P. argues that the language of RCW 71.05.215, a provision of the ITA, did not authorize the court to order that he undergo involuntary blood draws. He further argues that the court's authorization departs from the legislative intent of the ITA as expressed in RCW 71.05.010. The Department responds that N.P. is relying on the wrong statute. The Department argues that because blood draws are a medically necessary component of treatment with Clozaril, they fall within the "administration" of that medication and are, therefore, authorized under RCW 71.05.217. N.P. offers no reply to this argument.

Questions of statutory interpretation call for de novo review by this court. *State v. Schwartz*, 194 Wn.2d 432, 439, 450 P.3d 141 (2019). "The goal of statutory interpretation is to discern and implement the legislature's intent." *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). First, we look to the plain language of the statute. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003); *Armendariz*, 160 Wn.2d at 110. "When the plain language is unambiguous—that is, when the statutory language

4

admits of only one meaning—the legislative intent is apparent, and we will not construe the statute otherwise." *J.P.*, 149 Wn.2d at 450. If, however, the plain language of the statute leads to more than one reasonable interpretation, then the statute is ambiguous, and "[t]his court may attempt to discern the legislative intent underlying an ambiguous statute from its legislative history." *Armendariz*, 160 Wn.2d at 110-11. This court may turn to the dictionary definition of the term to determine the plain meaning of a statute when the statute itself does not define a term. *State v. J.K.T.*, 11 Wn. App. 2d 544, 552, 455 P.3d 173 (2019).

The provisions of chapter 71.05 RCW compromise our state's ITA. As provided in RCW 71.05.010(1), the legislative purposes behind the ITA are:

> (a) To protect the health and safety of persons suffering from behavioral health disorders and to protect public safety through use of the parens patriae and police powers of the state;
> (b) To prevent inappropriate, indefinite commitment of persons living with behavioral health disorders and to eliminate legal disabilities that arise from such commitment;
> (c) To provide prompt evaluation and timely and appropriate treatment of persons with serious behavioral health disorders;
> (d) To safeguard individual rights;
> (e) To provide continuity of care for persons with serious behavioral health disorders;
> (f) To encourage the full use of all existing agencies, professional personnel, and public funds to prevent duplication of services and unnecessary expenditures; and
> (g) To encourage, whenever appropriate, that services be provided within the community.

N.P. relies on RCW 71.05.215(1) to argue the trial court does not possess the statutory authority to authorize involuntary blood draws to monitor antipsychotic medication.

Under RCW 71.05.215(1),

> [a] person found to be gravely disabled or to present a likelihood of serious harm as a result of a behavioral health disorder has a right to refuse antipsychotic medication unless it is determined that the failure to medicate may result in a likelihood of serious harm or substantial deterioration or substantially prolong the length of involuntary commitment and there is no less intrusive course of treatment than medication in the best interest of that person.

RCW 71.05.215(1) speaks to a person's right to refuse antipsychotic medication, as well as to an exception to that right of refusal. The statute neither authorizes nor expressly prohibits involuntary blood draws as part of treatment.

Turning to RCW 71.05.217, on which the Department relies, the statute provides:

> (1) Insofar as danger to the individual or others is not created, each person involuntarily detained, treated in a less restrictive alternative course of treatment, or committed for treatment and evaluation pursuant to this chapter shall have, in addition to other rights not specifically withheld by law, the following rights, a list of which shall be prominently posted in all facilities, institutions, and hospitals providing such services:
>
> . . . .
>
> (j) Not to consent to the administration of antipsychotic medications beyond the hearing conducted pursuant to RCW 71.05.320(4) or the performance of electroconvulsant therapy or surgery, except emergency lifesaving surgery, unless ordered by a court of competent jurisdiction pursuant to the following standards and procedures:

6

. . . .

(iv) An order for the administration of antipsychotic medications entered following a hearing conducted pursuant to this section shall be effective for the period of the current involuntary treatment order, and any interim period during which the person is awaiting trial or hearing on a new petition for involuntary treatment or involuntary medication.

The Department argues this statute controls the resolution of the instant issue because it establishes the procedures a court must follow, along with the findings the court must make, when ruling on a petition for involuntary administration of antipsychotic medication. Because blood draws are medically necessary for an individual taking Clozaril, the Department contends blood draws fall within the "administration" of that medication. N.P. does not assert any argument with respect to RCW 71.05.217(1)(j)(iv).

The ITA does not define "administration" as the word is used in RCW 71.05.217(1)(j)(iv). Neither party cites authority addressing whether the legislature intended the term "administration," as used in the statute, to encompass the authorization of medically necessary, involuntary blood draws from an individual. Because this court may look to dictionary definitions to ascertain the plain meaning of undefined statutory terms, we do so here.

"Administration," in the medical sense, is the giving or application of treatment, including the *way* the treatment is given. *Administration*, THE FREE DICTIONARY, https://medical-dictionary.thefreedictionary.com/administration (last accessed July 9,

7

2026) ("the giving or application of a pharmacologic or other therapeutic agent");

*Administration Procedure*, OPENMD.COM, https://openmd.com/define?q=administration

(last accessed July 9, 2026) ("In medicine, the act of giving a treatment, such as a drug, to

a patient. It can also refer to the way it is given, the dose, or how often it is given.");

*Administration*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-

webster.com/dictionary/administration (last accessed July 9, 2026) ("the act or process

of administering something"); *Administer*, MERRIAM-WEBSTER DICTIONARY,

https://www.merriam-webster.com/dictionary/administer (last accessed July 9, 2026) ("to

give remedially").

The *way* treatment is given to an individual may involve more than just providing

medication. Monitoring side effects through blood testing is often medically necessary

for the individual's health. For example, diabetics often must regularly test their blood

sugar levels as part of their treatment.

Considering this reasoning, these definitions, and the legislative purposes behind

the ITA, we conclude that the plain meaning of "administration," as the term is used in

RCW 71.05.217(1)(j)(iv), is unambiguous and permits the trial court to authorize a

person undergo involuntary blood draws if the blood draws are a medically necessary

component of giving treatment.

In the present case, Dr. Basnillo testified that taking Clozaril requires a blood cell

count every four weeks to monitor any side effects of the medication because the

medication can cause low white blood cells, and "sometimes it gets worse, it can cause death if we don't check the [complete blood count]." VRP at 14. He offered that, if N.P. were to stop taking the antipsychotic medications, including Clozaril, N.P. would become catatonic, stop eating, ignore his personal hygiene, and need to be transferred to the emergency room for medical intervention. The trial court, in addressing whether to authorize involuntary blood draws in connection with Clozaril at the hearing, found them to be an appropriate part of treatment for N.P.

Because periodic blood draws are a medically necessary part of Clozaril treatment, as established by the testimony offered by Dr. Basnillo, the trial court was authorized to order that N.P. undergo involuntary blood draws as part of the administration of that treatment under RCW 71.05.217(1)(j)(iv).[1]

*Right to Privacy*

N.P. also argues the trial court's authorization of involuntary blood draws without a warrant or an exception to the warrant requirement violated his right to privacy under

---

[1] N.P. argues that RCW 71.05.215(1) is comparable to RCW 46.20.308(4), the statute governing blood draws in connection with the operation of motor vehicles. We need not address this comparison as we conclude RCW 71.05.217(1)(j)(iv) authorizes blood draws under the present circumstances.

article I, section 7 of the Washington State Constitution and the Fourth Amendment[2] to the United States Constitution.

This court reviews constitutional claims de novo. *State v. Lundstrom*, 6 Wn. App. 2d 388, 393, 429 P.3d 1116 (2018). Under article I, section 7 of this state's constitution, "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."

This court applies a two-step analysis when analyzing article I, section 7 claims. *State v. Evans*, 5 Wn.3d 199, 209, 572 P.3d 1172 (2025). First, this court determines "whether the action complained of constitutes a disturbance of one's private affairs." *State v. Surge*, 160 Wn.2d 65, 71, 156 P.3d 208 (2007). If the court finds it does not, then there is no article I, section 7 violation. If, however, a privacy interest had been disturbed, then this court moves to the second step in the analysis, under which this court "asks whether authority of law justifies the intrusion." *Id*. "Authority of law includes a constitutional statute, a search warrant, or a recognized exception to the warrant requirement." *State v. Griffith*, 11 Wn. App. 2d 661, 676, 455 P.3d 152 (2019).

---

[2] While N.P. refers to both the state and federal constitutions, he does not cite any federal cases to support his argument that the trial court violated his Fourth Amendment right by authorizing that he undergo involuntary blood draws or specifically apply Fourth Amendment arguments to his appeal. We therefore decline to consider that argument in deciding this appeal. *See* RAP 10.3(6).

Importantly, a statute can provide the authority of law justifying the intrusion on one's private affairs "'only insofar as is reasonably necessary to further substantial governmental interests that justify the intrusion.'" *State v. Meredith*, 1 Wn.3d 262, 276, 525 P.3d 584 (2023) (quoting *State v. Chacon Arreola*, 176 Wn.2d 284, 292, 290 P.3d 983 (2012)).

While a blood draw done for the purpose of monitoring medication may involve a person's private affairs, RCW 71.05.217(1)(j)(iv) provides the authority of law to allow trial courts to authorize that a person undergo involuntary blood draws if they are medically necessary in the act of giving treatment. "Statutes are presumed to be constitutional." *State v. Econ. Dev. Bd. for Tacoma-Pierce County*, 9 Wn. App. 2d 1, 16, 441 P.3d 1269 (2019). *See also Ringhofer v. Ridge*, 172 Wn. App. 318, 327, 290 P.3d 163 (2012); *Leonard v. City of Spokane*, 127 Wn.2d 194, 197, 897 P.2d 358 (1995). N.P. does not argue RCW 71.05.217(1)(j)(iv) is unconstitutional. N.P. also does not argue that the Department lacks a compelling interest in ensuring those who are involuntarily committed remain safe and receive the treatment they need.

Therefore, because RCW 71.05.217(1)(j)(iv) is constitutional, and because the Department has a compelling interest in the safety of N.P., RCW 71.05.217(1)(j)(iv) provided the trial court with the authority of law necessary to authorize involuntary blood draws as medically necessary to monitor the side effects of Clozaril. We conclude that

11

No. 40994-5-III
*In re Det. of N.P.*

the trial court's authorization that N.P. undergo involuntary blood draws did not violate his right to privacy under article I, section 7 of the Washington State Constitution.

CONCLUSION

The trial court was authorized to order N.P. to undergo involuntary blood draws as part of the administration of that treatment under RCW 71.05.217(1)(j)(iv). This authorization did not violate N.P.'s right to privacy under article I, section 7 of the Washington Constitution.

We affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Hill, J.

WE CONCUR:

_____
Cooney, A.C.J.

_____
Murphy, J.

12